McLaughlin & Stern, LLP
260 Madison Avenue, 20th Floor
New York, NY 10016
(212) 448-1100
Attorneys for Plaintiff, GUNVOR S.A.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

GUNVOR S.A.,

                      Plaintiff,

VALERO MARKETING AND SUPPLY CO.,

                      Defendant.
----------------------------------------------------------X

18 Civ-2005

**COMPLAINT**

Plaintiff, Gunvor S.A., ("Plaintiff"), by its undersigned attorneys, McLaughlin & Stern, LLP, as and for its Complaint against defendant, Valero Marketing and Supply Co., ("Defendant"), herein alleges as follows.

FIRST:  Plaintiff is a corporation organized and existing under the laws of Switzerland and has an office and place of business at 80-84 Rue du Rhône, 1204 Geneva, Switzerland.

SECOND:  On information and belief Defendant is incorporated and existing under and by virtue of the laws of Delaware with an office and principal place of business at One Valero Way, San Antonio, Texas 78249-1616.

THIRD:  This Honorable Court has subject matter jurisdiction over this case as the amount in controversy is in excess of $75,000 and there is diversity of citizenship

between Plaintiff and Defendant. In the alternative, this case and dispute arise under this Honorable Court's admiralty and maritime jurisdiction and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

FOURTH: On or about January 22, 2015, Plaintiff, as seller, and Defendant, as buyer, agreed to terms for the sale and purchase of 90-130,000 metric tons, in Plaintiff's option, of M100 fuel oil (the "Contract"). Delivery was to be at "1 safe port 1 safe berth or discharge place DES, St. Charles, Louisiana basis arrival March 25-April 5, 2015." Delivery was to be effected "on board seller's nominated vessel MT TBN/SUB [motor tanker to be named or substitute], which is acceptable to buyer". The terms of the sale so agreed were confirmed in a facsimile later sent on or about February 27, 2015.

FIFTH: On or about February 23, 2015, Plaintiff provided details, including the air draft (i.e., the highest point of a vessel above the water line) in both loaded and in normal ballast for sea for the M/T EUROCHAMPION 2004 (hereafter the "Vessel") and asked Defendant "if M/T Eurochampion 2004 would be acceptable to deliver 90-130 KT of HSSR fuel oil to St. Charles March 25-April 5, 2015." This request was passed to "Valero Vetting" which replied on or about that same day "M/V Eurochampion 2004 is approved for use by Valero."

SIXTH: In fact, the Vessel had been nominated to and accepted for use by Defendant under a prior contract between Plaintiff and Defendant and the Vessel had previously carried a fuel oil cargo to Defendant's St. Charles facility and there discharged that cargo and safely departed from St. Charles, for sea, without incident.

SEVENTH:   Following receipt of the foregoing approval of the Vessel from Defendant, Plaintiff entered into a charter party with the Vessel's disponent owners for use of the Vessel under the Contract and Plaintiff nominated the Vessel to Defendant for delivering the goods in question under the Contract.

EIGHTH:   The Contract contemplated that Plaintiff would enter into a charter party with a third party (hereinafter referred to as "Vessel Owner") for use of the Vessel. The Contract further provided for Defendant to be responsible for Vessel laytime and demurrage associated, *inter alia*, with waiting time, delivery and discharge at Defendant's nominated port, with the Contract specifically incorporating parts of the charter party for this purpose by providing in Contract Clause 13, the "Laytime and Demurrage" clause," in part, as follows:

> Buyer has an independent obligation to pay for demurrage incurred at the discharge port after deduction of a laytime allowance of 36 hours.
>
> \*\*\*
>
> Demurrage will be payable on the basis of the charter party rate applicable to the carrying vessel.
>
> \*\*\*
>
> Laytime and demurrage as per charterparty terms and conditions …
>
> \*\*\*
>
> The buyer shall promptly notify the sellers of any objections to any demurrage claim under this contract.  Unless the sellers have received such notification together with details of the grounds for the objections within 30 days after the buyers' receipt of the claim, the buyers shall be deemed to have waived objection to the claim

3

and the buyers shall be liable to pay the claim in the amount claimed without deduction or set off.

The buyer shall pay demurrage due without delay, but in any event not later than 90 days after the buyers' receipt of the demurrage claim failing which interest will be payable by the buyers at the rate of BBA LIBOR plus 4% on the demurrage due.

NINTH:   The terms of the charter party which were incorporated into the Contract and by which Defendant was to have, by reason of Contract clause 13, certain obligations of the "Charterer", included the following with respect to the Vessel, the discharge port and lightering.

    1.   WARRANTY – VOYAGE – CARGO

\*\*\*

… and being so loaded shall forthwith proceed, as ordered on signing of Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo.

\*\*\*

    9.   SAFE BERTHING – SHIFTING

The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the vessel can proceed thereto, lie at, and depart therefrom always afloat, any lighterage being at the expense, risk and peril of the Charterer …

TENTH:   The Contract also provided that interest on late payments by Defendant is due at 4% per annum plus LIBOR (clause 10 and 13); that it was to be

governed by the laws of New York (Clause 15); that it was subject to exclusive jurisdiction of the New York courts (Clause 15); that it "contains the entire agreement between the parties and supersedes all previous negotiations, agreements or commitments" (Clause 19); and that the Defendant would indemnify Plaintiff from all losses, damages, costs and expenses, including legal fees incurred by reason of any default by Defendant (Clause 23 E).

ELEVENTH:   The Vessel arrived at customary anchorage off St. Charles and tendered notice of readiness to discharge on April 3, 2015 and anchored to await a loading berth at Defendant's St. Charles facility.

TWELFTH:   A berth became available at Defendant's St. Charles facility on April 8, 2015 whereupon the Vessel was called to proceed up river which included passing under the Huey P. Long Bridge (sometimes referred to as the "Bridge"). However, the Master was concerned about the height of the water in the river, which had recently risen, and the impact this would have after he completed discharge, took on ballast, and then proceeded back out to sea under the Huey P. Long Bridge. His particular concern was that the Vessel, after discharge and taking on ballast for sea, would not be able to safely pass under the Bridge due to the Vessel's air draft which he calculated would be greater than the vertical clearance of the Huey P. Long Bridge at the time of departing St. Charles due to the recent rise in the water level under the Bridge.

THIRTEENTH: On April 8, 2015, prior to arrival at Defendant's facility, the Master protested these conditions by sending an email to all concerned, including Defendant, stating, in part, the following:

> PLS NOTE DUE TO LIMITATION ON AIR DRAFT & VERTICAL CLEARANCE AT HP LONG BRIDGE, VESSEL CANNOT DISCHARGE HER ENTIRE PARCEL OF REMAINING CARGO UPON SECOND BERTHING. QUANTITY OF CARGO THAT CAN BE DISCHARGED UPON SECOND BERTHING IS SUBJECT TO ACTUAL RIVER GAUGE ON DATE OF COMPLETION. AGENT REQUESTED TO INFORM ALL PARTIES CONCERNED.

FOURTEENTH: Plaintiff thereafter advised Defendant that the Vessel would have to leave a quantity of cargo on board the Vessel after partial discharge at Defendant's berth in order to safely pass under the Bridge on departure from Defendant's berth and thereafter discharge the balance of the Vessel's cargo seaward of the Bridge, to which Defendant replied "Please present options for delivering this cargo to Valero within the tolerance that was agreed upon."

FIFTEENTH: Plaintiff then looked into arranging lighters and tugs to lighter the remaining cargo on the seaward side of the Bridge for carriage back to Defendant's facility, following discharge of that portion of the cargo that could be safely discharged at Defendant's berth. It also advised Defendant that in light of "your acceptance of mt Eurochampion 2004 for discharging at one safe port/berth basis St. charle [sic], all costs related to lightering operation will be charged to Valero".

6

SIXTEENTH:   On April 9, 2015 the Vessel berthed and began discharge at Defendant's berth, completing that portion of the discharge that could be accomplished there, leaving on board a cargo quantity of approximately 56,500 metric tons of cargo.

SEVENTEENTH:   The Vessel thereafter departed St. Charles and passed under the Bridge to a lighterage location on the seaward side of the Bridge to lighter the balance of its cargo into lighters for carriage to Defendant's facility.  This was accomplished on or about April 14, 2015 (the entire lightering procedure from departure St. Charles is hereafter referred to as the "Lightering Operation").

EIGHTEENTH:   The Lightering Operation led to costs duly invoiced by Plaintiff to Defendant for lighters ($411,568.35), lighterage support costs ($51,411.75), associated port costs for lightering ($78,098.43) and lighter towage costs ($49,458.06) for a total of $590,536.59 (hereafter "Lightering Costs").  In addition, the Vessel incurred demurrage time associated with this Lightering Operation as outlined below (hereafter "Lightering Demurrage").

NINETEENTH:   Prior to the Vessel proceeding to the lightering location, the Vessel had already incurred demurrage respecting partial discharge at Defendant's berth ("Berth Demurrage").

TWENTIETH:   Plaintiff has paid all demurrage due to its Vessel Owner under the charter party covering all Vessel operations, both at the berth and at the lighterage location.

TWENTY-FIRST:    Plaintiff has also paid all Lightering Costs due to its Vessel Owner under the charter party.

TWENTY-SECOND:    On or about April 30, 2015 Plaintiff invoiced Defendant for all demurrage, in a single invoice, for an amount that covered both the Berth Demurrage and the Lightering Demurrage in the total amount of $311,506.25. Plaintiff included with this claim the demurrage invoice that Plaintiff had been invoiced from its Vessel Owner under the charter (in a higher demurrage amount) but without Plaintiff providing proof of payment by Plaintiff of demurrage to its Vessel Owner.

TWENTY-THIRD:    Following receipt of this invoice, Defendant did not, within the time provided for making objection to demurrage under clause 13 of the Contract, object to the lack of proof of payment of demurrage by Plaintiff to its Vessel Owner. However, Defendant did seek a number of modest changes to the counting of time respecting Berth Demurrage and asked Plaintiff, if it agreed to these modest changes, to send a separate invoice adopting these changes and covering this revised amount respecting Berth Demurrage only so that Defendant could pay this undisputed demurrage.

TWENTY-FOURTH:    Pursuant to Defendant's request, Plaintiff sent Defendant a separate invoice for Berth Demurrage only in the amount of $155,321.88, the amount as revised by Defendant, again without proof of payment of demurrage by Plaintiff to its Vessel Owner. Defendant then paid this amount, again without objecting to the lack of proof of payment of demurrage by Plaintiff to its Vessel Owner within the time provided in Contract clause 13 for objecting to demurrage.

TWENTY-FIFTH:   Thereafter, Plaintiff invoiced Defendant for the Lightering Costs of $590,536.59 and the Lightering Demurrage of $119,240.63, the amount separately calculated for that portion of demurrage, for a total of $709,777.22 which Defendant has failed and refused to pay.

## COUNT I

TWENTY-SIXTH:   Plaintiff repeats and realleges the allegations contained in paragraphs FIRST through TWENTY-FIFTH of this Complaint as if set forth herein at length.

TWENTY-SEVENTH:   Defendant warranted in the Contract that it would provide "1 safe port 1 safe berth or discharging place DES St. Charges, Louisiana basis arrival March 25-April 5, 2015." It further specifically approved the Vessel for making delivery at its St. Charles facility under the Contact during the period specified in the Contract.

TWENTY-EIGHTH:   A warranty of a safe berth and port, such as Defendant made in this case, includes a warranty that a vessel may safely arrive, discharge and depart from said berth and port and that the accesses for arriving at and departing from the berth and port are safe. This includes that the vessel can safely pass under any bridges to and from the port and berth.

TWENTY-NINTH:   In this case, because the Vessel was unable to discharge and safely depart St. Charles in the normal course, without lightering, Defendant

breached the Contract by failing to provide a safe berth and port and the accesses thereto from which the specifically approved Vessel could fully discharge and safely depart.

THIRTIETH:   This breach gave rise to Plaintiff suffering damages consisting of the Lightering Costs and the Demurrage for Lightering.

THIRTY-FIRST:   By reason of the foregoing premises, Defendant is liable to Plaintiff for Lightering Costs and Demurrage for Lightering in the combined amount of $709,777.22.

## COUNT II

THIRTY-SECOND:   Plaintiff repeats and realleges the allegations contained in Paragraphs FIRST through TWENTY-FIFTH of the Complaint as if set forth herein at length.

THIRTY-THIRD:   By reason of paragraphs 1 and 9 of the incorporated charter party provision recited in paragraph NINTH above, Defendant warranted that the Vessel may proceed to the discharge port "or so near thereto as she may safely get (always afloat), and deliver the cargo" either at "any safe place or wharf, or alongside vessels or lighters" with "any lightering being at the expense, risk and peril" of the Defendant.

THIRTY-FOURTH:   As outlined above, it was necessary to discharge some of the Vessel's cargo into lighters and this gave rise to the Lightering Costs and Demurrage for Lightering for which Defendant is responsible under the foregoing charter party clause incorporated into the Contract.

By reason of the foregoing premises, Defendant is liable to Plaintiff for the Lightering Costs and the Demurrage for Lightering in the amount of $709,777.22.

### COUNT III

THIRTY-FIFTH: Plaintiff repeats and realleges the allegations contained in Paragraphs FIRST through TWENTY-FIFTH of the Complaint as if set forth herein at length.

THIRTY-SIXTH: Under the Contract and incorporated terms of the charter party, Defendant was obligated to pay demurrage for all the waiting and discharge time exceeding 36 hours.

THIRTY-SEVENTH: In this case, the Vessel continued to discharge the Vessel at the lightering position and experienced waiting time at the lightering position.

THIRTY-EIGHTH: By reason of the foregoing premises, Defendant is liable to Plaintiff for the Demurrage for Lightering in whole or, at the very least, in part, for the demurrage time associated with discharge of the remaining cargo at the lightering position.

### COUNT IV

THIRTY-NINTH: Plaintiff repeats and realleges the allegations contained in Paragraphs FIRST through THIRTY-EIGHTH of the Complaint as if set forth herein at length.

FORTIETH: By reason of the foregoing premises, Defendant was and is in default in its payment obligations under the Contract. Under Clauses 10 and 13 of the

Contract, Defendant is obliged to pay Plaintiff interest at the rate of BBA LIBOR plus 4% on late payments by Defendant.

FORTY-FIRST:   BBA LIBOR, or British Banker's Association London Interbank Offered Rate, is a published interest rate. It is now known as ICE LIBOR, or the Intercontinental Exchange LIBOR. The average LIBOR rates applicable in 2015 were 0.793%; in 2016 were 1.375%; and in 2017 were 1.79% and rising. With the additional 4% interest under the Contract, the appropriate interest rates under the Contract for late payments are 4.793% for 2015; 5.375% for 2016; and 5.79% per annum for 2017 for a combined average rate of contract interest of about 5.32% per annum for the period and rising, as best as can be presently calculated.

FORTY-SECOND:   By reason of the foregoing premises, Plaintiff is entitled to contract interest at the rate of no less than 5.4% per annum on the Lightering Costs and Demurrage for Lightering from at least June 1, 2015 until the entry of judgment.

### COUNT V

FORTY-THIRD:   Plaintiff repeats and realleges the allegations contained in Paragraphs FIRST through FORTY-SECOND of the Complaint as if set forth herein at length.

FORTY-FOURTH:   Under Clause 23 of the Contract, Plaintiff is entitled to indemnification for its legal fees in pursuit of its claims under the Contract.

FORTY-FIFTH:   By reason of the foregoing, Defendant is obliged to pay Plaintiff all legal fees and costs arising in this case.

WHEREFORE, Plaintiff prays for judgment against Defendant in the amount of $709,777.22 with interest, and costs, including Contract interest at no less than 5.4% per annum from at least June 1, 2015 until entry of judgment on Plaintiff's claims in the total amount of $709,777.22 and for all Plaintiff's legal fees, costs and disbursements in connection with this case and/or for such other amounts and/or for such other remedies as to this Court may seem just and proper.

Dated:   New York, New York
         March 6, 2018

> McLAUGHLIN & STERN, LLP
> Attorneys for Plaintiff, GUNVOR S.A.,
>
> By: _____
>     Armand M. Paré, Jr.
>     260 Madison Avenue
>     New York, NY 10016
>     Telephone: (212) 448-1100
>     Email: jpare@mclaughlinstern.com